IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

AIKEN DIVISION

| | | |
|---|---|---|
| IN RE GRANITEVILLE TRAIN DERAILMENT | ) ) ) | |
| Jessica Curtis, Timothy Ard, James Splawn, Bethlehem Baptist Church of Graniteville, Inc., Mike Williams Construction LLC, Elizabeth R. Cutright, and Tina Bevington, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | C/A No. 1:05-115-MBS |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| Norfolk Southern Railway Company, | ) ) | |
| Defendant. | ) ) | |

**FINAL ORDER AND JUDGMENT CERTIFYING THE CLASS FOR PURPOSES OF SETTLEMENT, APPROVING THE CLASS ACTION SETTLEMENT, APPROVING ATTORNEYS' FEES, AND DISMISSING THE ACTION WITH PREJUDICE**

Upon considering (1) Plaintiffs' Motion for Certification of a Class for Purposes of Settlement (the "Certification Motion") filed August 15, 2005; (2) the Joint Motion for Approval of Class Settlement (the "Joint Motion"), filed August 10, 2005 by Plaintiffs Jessica Curtis; Timothy Ard; James Splawn; Bethlehem Baptist Church of Graniteville, Inc.; Mike Williams Construction LLC; Elizabeth Cutright, and Tina Bevington, individually and on behalf of all others similarly situated (the "Class Representatives") and Defendant Norfolk Southern Railway Company ("NSRC"), seeking approval of the Proposed Settlement Agreement (the "PSA" or the "Proposed

Settlement," on file with the court as Exhibit A to the Joint Motion for Preliminary Approval of Class Settlement, Class Notice and Related Matters, filed May 26, 2005); and (3) Class Counsels' Motion for Approval of an Award of Attorneys' Fees and Memorandum in Support Thereof filed August 15, 2005; and the court having held a hearing on August 17, 2005 at the Charles E. Simons, Jr. Federal Courthouse in Aiken, South Carolina at which it heard representations, arguments, and recommendations of counsel for the moving parties; and having considered the requirements of law,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

1.    The court has jurisdiction over the subject matter and parties to this proceeding pursuant to 28 U.S.C. § 1332.

2.    Venue is proper in this district.

3.    The capitalized terms used in this Final Order and Judgment shall have the following meanings:

"Class Members" means (i) all natural and juridical and legal persons (or, in the case of minority, death or incapacity, their tutors, successions, or legal guardians or representatives) and entities in the Class who do not Opt Out (as defined below) in accordance with Fed. R. Civ. P. 23(c)(2) and the procedures set forth in the Notice, and (ii) all natural persons (or, in the case of minority, death or incapacity, their tutors, successions, or legal guardians or representatives) who are not members of Subclass 3 by definition but who have elected to Opt In to Subclass 3 (as defined below), in accordance with the provisions of the PSA and the procedures set forth in the Notice.

"Evacuation Zone A" shall mean those areas within a one mile radius of the place of derailment in which a shelter-in-place occurred and a mandatory evacuation was ordered on January 6, 2005, and the period of mandatory evacuation extended beyond 11:59 p.m. Eastern Standard Time on January 9, 2005 and are those areas designated as Evacuation Zone A on the map attached to the PSA as Exhibit B.

"Evacuation Zone B" shall mean those areas outside the one mile radius from the place of derailment in which a shelter-in-place and/or mandatory evacuation order was issued on January 6, 2005, and the period of mandatory evacuation did not

2

extend beyond 11:59 p.m. Eastern Standard Time on January 9, 2005 and are those areas designated as Evacuation Zone B on the map attached to the PSA as Exhibit B.

"Incident" means the January 6, 2005 train collision, derailment, release of chlorine, emergency response, clean-up, shelter-in-place, and evacuation at Graniteville, South Carolina.

"Medical Treatment" shall mean medical actions taken to cure, treat or remedy an objective manifested physical injury except that the term "Medical Treatment" does not include (i) any diagnostic examinations or tests, (ii) any medical or other actions taken to decontaminate the body, or any parts of the body, of a person from chlorine due to the Incident, or (iii) any medical or other actions taken to prevent exposure to chlorine or injury and not to cure, treat or remedy an already existing objective manifested physical injury.

"Opt In to Subclass 3" shall mean the process for all natural persons (or, in the case of minority, death or incapacity, their tutors, successions, or legal guardians or representatives), who are not members of Subclass 3 by definition only because they are persons with claims and damages for (i) wrongful death or related survival actions arising out of, related to, resulting from, or connected in any way with the Incident; (ii) personal injuries where the person received Medical Treatment from a licensed physician, or a licensed health care provider at a hospital emergency room, for an objective manifested physical injury due to exposure to chlorine from the Incident within 72 hours of the Time of Derailment (as defined below); (iii) emotional distress that caused manifested objective physical symptoms that were diagnosed by a licensed physician prior to February 15, 2005 as being caused by having contemporaneously observed a closely-related person being exposed to chlorine on January 6, 2005 due to the Incident and the occurrence of serious injury or death of that closely-related person, where that closely-related person is excluded from Subclass 3 because of death or having received Medical Treatment from a licensed physician or other licensed health care provider at a hospital emergency room within 72 hours of the Time of Derailment (as defined below); or (iv) loss of consortium related to a direct claim that is expressly excluded from Subclass 3, to elect inclusion in Subclass 3 in accordance with the provisions of the PSA and the procedures set forth in the Notice.

"Opt Out" shall mean the process for all natural and juridical and legal persons (or, in the case of minority, death or incapacity, their tutors, successions, or legal guardians or representatives) and entities to exercise their right to exclude themselves from the Class in accordance with Fed. R. Civ. P. 23(c)(2) and the procedures set forth in the Notice.

3

"Opt Outs" shall mean those natural and juridical and legal persons (or, in the case of minority, death or incapacity, their tutors, successions, or legal guardians or representatives) and entities included in the Class who have timely and properly exercised their right to Opt Out of all subclasses (Subclass 1, Subclass 2 and Subclass 3), and therefore are not Class Members.

"Time of Derailment" means 2:38 a.m. Eastern Standard Time on January 6, 2005.

4.    For the reasons set forth hereinbelow, certification for settlement purposes only of the proposed class and each of the subclasses, as defined and set forth in paragraph 5, is appropriate under Fed. R. Civ. P. 23(a) and 23(b)(3); accordingly, the Certification Motion is **GRANTED**.

The party seeking to utilize Rule 23 bears the burden of establishing that the requirements of the rule are satisfied.  Cruz v. Robert Abbey, Inc., 778 F. Supp. 605, 612 (E.D.N.Y. 1991).  With respect to Rule 23(a), the party seeking certification must demonstrate that (1) the class is so numerous that joinder of all members is impracticable; (2)  there are questions of law or fact common to the class; (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties be able to fairly and adequately protect the interests of the class.  Simply stated, Rule 23(a) mandates numerosity, commonality, typicality, and adequacy of representation.

a.    **Numerosity**.  The evidence demonstrates that approximately 5,400 persons and 1,850 premises were affected by the Incident.  To date, approximately  3,500 individuals and/or entities have asserted claims.   Joinder of all these individuals and entities in the action is impracticable.  Thus, the Rule 23(a)(1) numerosity requirement has been met.

b.    **Commonality**:  Commonality exists when the legal question linking the class members is substantially related to the resolution of the litigation.  Thompson v. American Tobacco Co., 189 F.R.D. 544 (D. Minn. 1999) (citing DeBoer v. Mellon Mortgage Co., 64 F.3d 1171, 1174

4

(8th Cir. 1995)).  This provision does not require that all the questions of law and fact raised by the dispute be in common.  7A C.A. Wright <u>et al.</u>, Federal Practice and Procedure:  Civil 2d § 1763. Courts give the commonality requirement a permissive reading, requiring plaintiffs to show only that there is more than one issue of law or fact in common.  <u>Id.</u>; <u>see also</u> <u>Wagner v. NutraSweet Co.</u>, 170 F.R.D. 448, 451 (N.D. Ill. 1997).  An issue of law or fact is common if its resolution will advance the litigation.  <u>Sprague v. General Motors Corp.</u>, 133 F.3d 388, 397 (6th Cir. 1998).

The Class Representatives argue that the Incident  was the common event that triggered all of the Class Representatives' and Class Members' claims.  The release of chlorine and subsequent emergency response, clean-up, shelter-in-place, and evacuation were consequences of this single event.  The Class Representatives contend that the putative Class Members' claims  hinge on common questions of fact regarding the Incident and types of damages allegedly caused by the Incident.  The Class Members further note that the legal questions appertaining to this action arise under South Carolina law and are common to the Class.  The court finds that the resolution of the disputes enumerated by the Class Representatives will advance the litigation and are common to the prospective Class Members.  The Rule 23(a)(2) commonality requirement has been met.

c.    **Typicality**:  The typicality and commonality requirements of Rule 23(a) ensure that only those plaintiffs who can advance the same factual and legal arguments may be grouped together as a class.  <u>Broussard v. Meineke Discount Muffler Shops, Inc.</u>, 155 F.3d 331, 340 (4th Cir. 1998) (quoting <u>Mace v. Van Ru Credit Corp.</u>, 109 F.3d 338, 341 (7th Cir. 1997)).  "'The premise of the typicality requirement is simply stated; as goes the claim of the named plaintiff, so go the claims of the class.'"  <u>Id.</u> (quoting <u>Sprague v. General Motors Corp.</u>, 133 F.3d 388, 399 (6th Cir. 1998)).  The typicality requirement for class certification should be determined with reference

5

to the defendant's actions, and not with respect to any particularized defenses it might have against certain class members. Wagner v. Nutrasweet Co., 95 F.3d 527, 534 (7th Cir. 1996). Factual differences will not render a claim atypical if the claims of the representatives and members of the class stem from the same alleged practice or course of conduct and are based upon the same legal theories. Barnes v. American Tobacco Co, 161 F.3d 127, 141 (3d Cir. 1998).

The Class Representatives note that they allege various causes of action for certain minor personal injuries and emotional distress, demonstrable physical injury to personal and real property, business loss and other economic losses. The Class Representatives assert that their claims arise from the same course of conduct and share the same legal theories as do the claims of the Class Members. The court agrees, and finds that the Rule 23(a)(3) typicality requirement has been met.

　　　　d.　　**Adequacy**: The adequacy of representation requirement encompasses two distinct inquiries designed to protect the interests of absentee class members. First, it tests the qualifications of counsel to represent the class. Second, it serves to uncover conflicts of interest between named parties and the class they seek to represent. Barnes v. American Tobacco Co, 161 F.3d 127, 141 (3d Cir. 1998) (citing cases). Stated differently, the class representative's claims must be sufficiently interrelated to and not antagonistic with the class's claims as to ensure fair and adequate representation. Emig v. American Tobacco Co., 184 F.R.D. 379 (D. Kan 1998) (quoting Zapata v. IBP, Inc., 167 F.R.D. 147, 160 (D. Kan. 1996)). Satisfaction of this requirement is essential because otherwise the due process rights of the absentee class members bound by the judgment would be implicated. Barnes, 161 F.3d at 141 (citing Zapata, 167 F.R.D. at 161).

The Class Representatives argue that they assert claims representative of the claims of the entire Class (i.e., certain minor personal injuries and emotional distress, demonstrable physical injury

to personal and real property, business loss and other economic losses). The Class Representatives contend that their interests are not antagonistic to those of the Class as a whole, but are coextensive with those of the other Class Members.

The court recognizes that two Class Representatives, Elizabeth R. Cutright and Tina Bevington, expressed reservations with the settlement, although neither filed objections to the settlement in accordance with the procedures set forth in the Order for Preliminary Certification of a Class for Purposes of Settlement and Preliminary Approval of Class Settlement, Class Notice, and Related Matters and for Stay and Preliminary Injunction filed May 27, 2005. In fact, both individuals filed claims in the appropriate Subclasses of which they are members, and Ms. Cutright elected to opt-out of Subclass 3 in order to pursue a separate claim against NSRC. It became apparent during the testimony of these individuals that they did not fully understand the terms and conditions of the Proposed Settlement. During the hearing, the claims and appeal procedures were explained to Ms. Bevington, who thereafter stated under oath that she was satisfied with the Proposed Settlement. The court instructed Class Counsel present at the hearing to meet with Ms. Cutright regarding the claims for which she seeks reimbursement. The court is of the opinion that these individuals may continue to adequately represent the interests of similarly situated Class Members. The court finds that the Class Representatives will fairly and adequately protect the interests of the Class.

The adequacy factor also requires the court to make a finding regarding the ability of Class Counsel to advance the interests of the Class. In this case, Class Counsel regularly engage in complex litigation similar to this case. They are experienced in mass tort litigation and class actions. They have dedicated substantial resources to the prosecution of this matter. The court finds that

7

Class Counsel have and will vigorously represent the Class. Thus, the adequacy requirements of Rule 23(a)(4) are satisfied.

Once the prerequisites of Rule 23(a) are met, a plaintiff must satisfy one of the conditions set forth in Rule 23(b) in order to maintain a class action. To prevail under Rule 23(b), there must be a showing that:

> (1)    the prosecution of separate actions by or against individual members of the class would create a risk of
>
> > (A)    inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> >
> > (B)    adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
>
> (2)    the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3)    the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . .

The Class Representatives have chosen to proceed under Rule 23(b)(3). In support of their position, the Class Representatives note that common legal and factual issues include: (a) liability for the train collision, derailment, release of chlorine, emergency response, clean-up, shelter-in-place, and evacuation; and (b) general causation and whether chlorine is capable of causing the injuries and damages claimed. The resolution of these questions will either prove or disprove essential elements of every Class Member's claim and will do so on a simultaneous, class-wide basis. The court finds

8

that the facts surrounding the Incident and legal issues arising as a result constitute a significant part of each Class Representative's and Class Member's case and predominate over any questions affecting only individual members.

The Class Representatives further assert that a settlement class that will determine the issues common to all Class Members and fix compensation for injury is superior to thousands of trials that would risk disparate results for similarly situated people and entities. The cost of litigation on a case-by-case basis would be extremely costly for each Class Representative and the Class Members, which could negatively impact their potential recovery. Piecemeal litigation would also tax the resources of the judiciary. The court finds that a class action is superior to other available methods for a fair and efficient adjudication of the putative Class Members' claims. The predominance and superiority requirements of Rule 23(b)(3) have been satisfied.

5.    The court certifies the following Class:

The "Class":  All persons or entities falling within one or more of the following subclasses, including any person or entity claiming by, through or under a Class Member, including any person or entity claiming a subrogation interest for amounts paid on behalf of Class Members, but excluding those persons or entities set forth below:

"Subclass 1 (Property Damage)" or "Subclass 1":  All persons or entities (including minors and adults, corporations, partnerships, unincorporated associations, and/or other entities) who (a) on January 6, 2005 owned, leased, rented or held a possessory interest in any real or personal property situated within the geographical boundaries of the area of the Evacuation Zone A, and (b) sustained demonstrable physical injury to such personal property and/or real property due to exposure to chlorine as a result of the Incident.

"Subclass 2 (Evacuation Class: business interruption, inconvenience, and nuisance)" or "Subclass 2":  All persons or entities (including minors and adults, corporations, partnerships, unincorporated associations, and/or other entities) who (a) on January 6, 2005 resided in, were present in, conducted business or were employed in, owned, leased, rented or held a possessory interest in any real or personal property situated within the geographical boundaries of the area of the Evacuation Zone A or

9

Evacuation Zone B, and (b) as a result of the Incident sustained non-medical expenses unreimbursed by NSRC, loss of use of, or access to, property, inconvenience, nuisance, involuntary confinement, shelter-in-place, fear, fright, duress, mental anguish, anxiety, and related emotional distress, demonstrable physical injury to personal property and/or real property due to evacuation and not exposure to chlorine, and/or other demonstrable and quantifiable business loss, including lost wages (including wages lost by employees because of closure due to the evacuation), lost profits, loss of rental value, diminution of real property value, business interruption expenses, and contribution and other losses incurred by churches, either alone or in addition to any damage due to exposure to chlorine to personal property and/or real property situated within the geographical boundaries of Evacuation Zone A.

"Subclass 3 (Minor Personal Injury and Emotional Distress Class)" or "Subclass 3": All natural persons, including minors and adults, who resided or worked in and were physically located within, the geographical boundaries of Evacuation Zone A or Evacuation Zone B at any time during the period from the Time of Derailment to two (2) hours thereafter, and who did not receive Medical Treatment from a licensed physician, or a licensed health care provider at a hospital emergency room, for an objective manifested physical injury due to exposure to chlorine from the Incident within 72 hours of the Time of Derailment.

Subclass 3 shall not include (a) persons who are/were employees, agents, members, officers, or volunteers with any federal, state, county, or local governmental or private agency, department or organization who responded to the Evacuation Zones during the Incident, including but not limited to police, fire, sheriff's office, emergency medical services, United States Environmental Protection Agency, and/or the South Carolina Department of Health and Environmental Control ("DHEC") who were not otherwise residents within the Evacuation Zones (as defined in the PSA) at the Time of Derailment and (b) persons with claims and damages for (i) wrongful death or related survival actions arising out of, related to, resulting from, or connected in any way with the Incident; (ii) personal injuries where the person received Medical Treatment from a licensed physician, or a licensed health care provider at a hospital emergency room, for an objective manifested physical injury due to exposure to chlorine from the Incident within 72 hours of the Time of Derailment; (iii) emotional distress that caused manifested objective physical symptoms that were diagnosed by a licensed physician prior to February 15, 2005 as being caused by having contemporaneously observed a closely-related person being exposed to chlorine on January 6, 2005 due to the Incident and the occurrence of serious injury or death of that closely-related person, where that closely-related person is excluded from Subclass 3 because of death or having received

Medical Treatment from a licensed physician or other licensed health care provider at a hospital emergency room within 72 hours of the Time of Derailment; and (iv) loss of consortium related to a direct claim that is expressly excluded from Subclass 3.

The Class (and all of the subclasses) shall not include: (i) NSRC or any of its employees, agents, contractors, and subcontractors, including employees of NSRC's agents, contractors or subcontractors, (ii) Avondale Mills, its parents, subsidiaries, or affiliates and their insurers, (iii) the judge overseeing the case and the judge's immediate family, (iv) persons or entities who at the time they settled and released their claims against NSRC were represented by attorneys, and whose attorneys participated in the settlement or acquiesced to the settlement with a release of such persons' or entities' claims but only to the extent of the claims released, and (v) Opt Outs.

The class certification for purposes of settlement pertains to the following claims:

Any and all claims whatsoever, as described below, by a Class Member, his/her/its successors, assigns, heirs, or beneficiaries, any natural, legal or juridical person or entity entitled to assert any claim on behalf of any Class Member, and any person or entity who or which derives or obtains any right from or through any Class Member, against NSRC under any legal or equitable theory, or body of law, whatsoever, including but not limited to, negligence, strict liability, *res ipsa loquitur*, negligence per se, liability for ultra-hazardous activities or conduct, absolute liability, liability for any wanton or reckless conduct, liability for intentional or deliberate acts, liability that is derivative or vicarious arising out of the conduct or fault of others for which NSRC may be legally responsible, whether statutory, regulatory, or case law, whether federal, state, or local, arising out of, related to, or connected in any way with the Incident but only as pertains to each respective subclass.

6.     For the reasons set forth hereinbelow, the Joint Motion is **GRANTED**.  The court approves the Proposed Settlement dated May 24, 2005, together with all  exhibits, on file with the court as Exhibit A to the Joint Motion for Preliminary Approval of Class Settlement, Class Notice and Related Matters, filed May 26, 2005, as being fair, adequate, and reasonable and in the best interests of the Class, thereby satisfying Fed. R. Civ. P. 23(e).

Rules 23(e) provides that "[t]he court may approve a settlement, voluntary dismissal or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.

a.    Fairness of the Proposed Settlement.  The fairness factors pertain to whether there has been arm's length bargaining.  See In re Mid-Atlantic Toyota Antitrust Litig., 564 F. Supp. 1379, 1383 (D. Md. 1983); South Carolina Nat'l Bank v. Stone, 139 F.R.D. 335, 339 (D.S.C. 1991). The court must consider (i) the posture of the case at the time of settlement, (ii) the extent of discovery that has been conducted, (iii) the circumstances surrounding the negotiations, and (iv) the experience of counsel.  See In re Jiffy Lube Securities Litig., 927 F.2d 155, 158-59 (4th Cir. 1991). A proposed class action settlement is considered presumptively fair where there is no evidence of collusion and the parties, through capable counsel, have engaged in arm's length negotiations.  See South Carolina Nat'l Bank, 139 F.R.D. at 339.

The evidence presented at the hearing revealed that the parties exchanged information and engaged in substantial discovery.  Class Counsel was provided sufficient opportunity to examine the facts, issues, and to retain expert witnesses to aid in analyzing the case.  The court notes that Class Counsel are all experienced attorneys, and the evidence supports a finding that the parties engaged in protracted adversarial negotiations.   The facts and circumstances of the negotiations between Class Counsel and counsel for NSRC demonstrate that there has been considerable arm's length bargaining leading to the Proposed Settlement.

The purpose of the Proposed Settlement is to provide full compensation to the Class Members for their property damage claims and for evacuation-related expenses.  Chlorine exposure is presumed within the Inner Zone if damages of a certain type are established.  The PSA provides

for inspections of Class Members' property as part of the claims processing procedure, at no cost to Class Members. Class Members outside the Inner Zone may provide proof of real or personal property damage and receive full compensation. Qualifying Class Members also will receive compensation for minor personal injury in amounts ranging from $600 to $2,600 per Class Member. The amount is based on the Class Member's location within the geographical boundaries of Evacuation Zone A or Evacuation Zone B during the period from the Time of Derailment to two hours thereafter. The courts finds the sums are adequate in light of the definition of Subclass 3, which includes only persons who did not receive Medical Treatment within 72 hours of the Time of Derailment. The court also finds the sums to be adequate in light of the medical evidence indicating that illness due to exposure to chlorine manifests within 24 hours, and that there is no latency period after which symptoms may develop. In addition to reimbursement for out-of-pocket expenses, qualifying Class Members will receive payments of $2,000 or $1,000 per residential dwelling in Zone A or Zone B, respectively, to compensate for inconvenience suffered because of the evacuation. Qualifying Class Members also are entitled to a monetary recovery for Incident-related emotional damages. The Proposed Settlement makes appropriate and reasonable distinctions between different claims within the same class in order to arrive at adequate compensation amounts that reasonably correlate with the characteristics of a particular Class Member's claims. The Proposed Settlement offers prompt, and fair compensation. According to testimony presented by Ronnie G. Penton, Esquire, of the Louisiana Bar, the Proposed Settlement contemplates a level of compensation that is comparable to compensation amounts in similar mass-accident settlements involving like damages, with the additional benefit that the compensation is being paid within

13

months of the Incident, and not after years of litigation.   The court finds that the settlement is fair

and reasonable.

        b.    <u>Adequacy of the Proposed Settlement</u>.  To determine the adequacy of a class

settlement, the court must consider (i) the relative strength of the plaintiffs' case on the merits;

(ii) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter

if the case goes to trial; (iii) the anticipated duration and expense of additional litigation; (iv) the

solvency of the defendants and the likelihood of recovery of a litigated judgment; and (v) the degree

of opposition to the settlement. <u>See</u> <u>Jiffy Lube</u>, 927 F.2d at 159; <u>Flinn v. FMC Corp.</u>, 528 F.2d 1169,

1173-74 (4th Cir. 1976).

        i.    <u>Strength of the Class Members' Cases and Difficulties of Proof</u>.  The

evidence presented at the hearing revealed that chlorine acts immediately as a corrosive.  For

purposes of trial, claims of injury to real and personal property would require long-term preservation

of tangible evidence of chlorine-related harm, and could require expert testimony to prove both

causation and an amount of damages.  Further, to the extent any plaintiff desired to seek diminution

in the value of their real property, that person could be required to provide expert testimony to

demonstrate permanent damage to real property.  Douglas C. Brown, MAI, CRE evaluated the real

estate market in Graniteville.  He testified that he discerned no negative impact on property values

as a result of the Incident, and discovered no empirical data to support a finding of "stigma damage"

to real property within Evacuation Zones A or B.  Persons encompassed in Subclass 1 could face

substantial difficulties in proving the damages that are to be compensated by NSRC pursuant to the

PSA.

With respect to Subclass 2, South Carolina law generally provides that fear, fright, mental anguish, anxiety, and emotional distress must be established through the manifestation of physical symptoms before a plaintiff can recover for such claims. Individuals desiring to bring such claims face difficulties of proof with respect to establishing such physical symptoms, and many Class Members would not be entitled to recover at all. Intangible harm, such as inconvenience, cannot be quantified readily. Persons encompassed in Subclass 2 could face substantial difficulties in proving the damages that are to be compensated by NSRC pursuant to the PSA.

With respect to Subclass 3, injuries from chlorine exposure are apparent within 24 hours after exposure. According to expert testimony of Allen R. Leff, M.D., no latent or unknown conditions are associated with chlorine exposure. Thus, persons who suffered no physical injury likely would be precluded from recovery. Persons encompassed in Subclass 2 could face substantial difficulties in proving the damages that are to be compensated by NSRC pursuant to the PSA.

Moreover, NSRC disputes that it or its agents and employees acted unreasonably. NSRC also disputes that its or its agents' and employees' acts proximately caused the injuries complained of. Therefore, putative Class Members would face additional difficulties of proof in establishing all the elements of negligence set forth in the underlying complaint.

        ii.    <u>Complexity, Length and Expense of Further Litigation</u>. The duration and expense of continuing the litigation would be substantial. The court and the parties would benefit by avoiding what could be an enormous expenditure of time and resources.

        iii.    <u>Solvency of the Defendant</u>. This factor does not bear on the court's determination of the adequacy of the settlement given (1) size of the Class, (2) the nature of the types of claims by the Class Members (<u>i.e.</u>, property damage, property loss, minor personal injury), (3) the

anticipated amount of the aggregate payments under the Proposed Settlement, and (4) the amount of publicly-disclosed assets of NSRC.[1]

iv.    Response to Proposed Settlement and Degree of Opposition.  The majority of Class Members have filed claims, and no Class Member has filed an objection to the terms of the settlement in accordance with procedures set forth in the court's May 27, 2005 order. Counsel represented at the hearing that approximately 1,063 persons filed notices opting out of the Class; of these, 414 did not meet the Class definition so were not putative Class Members in any event.  Of the remaining 549 individuals who elected to opt-out, a number have changed their position and requested the opportunity to opt back in to the Class.

Georgina Riley, the Guardian Ad Litem, testified at the hearing that she had observed the claims process as it relates to minors and incompetents.  She offered her opinion that the Proposed Settlement and its procedures for payment are fair, adequate, and reasonable for minors and incompetents.

For all these reasons, and given the absence of any objection to the terms of the PSA, the court is satisfied that the Proposed Settlement is fair, reasonable, and adequate.

7.    The court finds the Objection to Class Certification/Settlement Terms filed July 15, 2005 to be without merit.  It appears that a number of opt-out forms were executed by counsel rather than the individual putative Class Member.  The gravamen of the objection was that there is no rational basis for preventing counsel from completing and signing forms on behalf of persons who wish to exclude themselves from the Class.  The court finds that it is reasonable to require each Class

---

[1]  See, e.g., www.sec.gov/edgar/searchedgar/webusers.htm; www.nscorp.com.

Member to personally sign his or her request for exclusion from the proposed Class. Such requirements for opting out are consonant with accepted class settlement practice and are reasonable. See, e.g., In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig., No. MDL 1203, 2003 WL 23162343, at * 1 (E.D. Pa. Dec. 3, 2004) (quoting order that for opt out to be effective, "opt-out right must be exercised individually, and a class member must personally sign the notice, not the class member's attorney"); Georgine v. Amchem Prods. Inc., 160 F.R.D. 478, 501 n.43 (E.D. Pa. 1995)("I have concluded on two prior occasions that it is improper for counsel to file an opt-out form on behalf of their present or future clients."). Nevertheless, the court will allow those persons whose opt-out notifications were signed by counsel a period of time until September 15, 2005, to comply with the request for exclusion procedure which the court approved in its May 27, 2005 Order. Persons meeting the definition of a Subclass who fail to comply with the opt-out procedures will be deemed to be Class Members.

8.      The court finds the objections to the PSA filed on August 1, 2005 to be without merit. The court granted NSRC's motion to strike the objections after a hearing on August 12, 2005, on the grounds that the objections were interposed by individuals who had opted out of the Class and therefore lacked standing to object to the settlement. Nevertheless, at the court's request Class Counsel addressed the objections at the fairness hearing. The court has considered the objections in determining whether the Proposed Settlement is fair, reasonable, and adequate, and concludes that the objections fail to assert any factual or legal basis for rejecting the Proposed Settlement.

9.      The court finds that the Notice and notice plan as carried out satisfy the requirements of Rule 23(e) and due process. The court previously found the Notice and notice plan to be the best practicable under the circumstances. NSRC, with the court's approval, undertook supplemental

procedures to address delays in the direct mailing prong of the notice plan, including hand delivery of flyers to affected areas and to premises throughout the Evacuation Zones. The opt-out deadline was extended to August 1, 2005.[2]  The claims filing deadline was extended to August 15, 2005 and then to September 15, 2005 to allow Class Members additional time to complete the process. Notice also was provided through English and Spanish language newspapers, the creation of a website, and postings in public areas. The multi-pronged notice strategy as supplemented and extended, the high level of public response, and the extent of local press coverage are ample demonstration that notice of the Proposed Settlement successfully reached the putative Class Members.

10.    The court reconfirms the appointment of Joseph F. Rice, Esquire of Motley Rice LLC and Terry E. Richardson, Esquire of Richardson, Patrick, Westbrook and Brickman LLC as Co-Lead Class Counsel for the Class, together with the other members of the Class Counsel Steering Committee identified on Exhibit A, as Class Counsel, under the terms set forth in the PSA.

11.    The court reconfirms the appointment of the Honorable A. Victor Rawl as the Special Master (as defined in the PSA) and directs the Honorable A. Victor Rawl to perform the responsibilities of the Special Master as set forth in the PSA. The court further reconfirms that the Special Master shall be compensated at an hourly rate of $300; provided, however, that the Special Master's aggregate fees ultimately will be subject to court approval, as set forth in the PSA.

12.    The court reconfirms the appointment of Georgina Riley as the Guardian Ad Litem (as defined in the PSA) and directs Georgina Riley to perform the responsibilities of the Guardian Ad Litem as set forth in the PSA. The court further reconfirms that the Guardian Ad Litem shall be

---

[2] As noted in paragraph 7, the opt-out deadline was extended at the fairness hearing to September 15, 2005 for those particular putative Class Members whose opt-out forms were executed by their counsel.

18

compensated at an hourly rate of $68; provided, however, that the Guardian Ad Litem's aggregate fees ultimately will be subject to the court's approval, as set forth in the PSA.

13.    At the parties' request, the court grants leave to those individuals who opted out of the Class but now wish to become Class Members to withdraw their opt-out status and file claims no later than September 15, 2005.

14.    To the extent the Proposed Settlement results in the splitting of the claim of any Class Member,  such result has been agreed to by the parties, and any remaining claim of a Class Member not subject to this Final Order and Judgment is expressly reserved.

15.    The "Released Claims" (as defined below) of any and all Class Members are HEREBY DISMISSED WITH PREJUDICE against all "Released Entities" (as defined below):

Released Claims:  Any and all claims whatsoever, as described below, by a Class Member, his/her/its successors, assigns, heirs, or beneficiaries, any natural, legal or juridical person or entity entitled to assert any claim on behalf of any Class Member, and any person or entity who or which derives or obtains any right from or through any Class Member, against any of the Released Entities under any legal or equitable theory, or body of law, whatsoever, including but not limited to, negligence, strict liability, *res ipsa loquitur*, negligence per se, liability for ultra-hazardous activities or conduct, absolute liability, liability for any wanton or reckless conduct, liability for intentional or deliberate acts, liability that is derivative or vicarious arising out of the conduct or fault of others for which the Released Entities may be legally responsible, whether statutory, regulatory, or case law, whether federal, state, or local, arising out of, related to, or connected in any way with the Incident but only as pertains to each respective subclass as follows:

a.    Subclass 1 and Subclass 2 Released Claims.  The term "Released Claim" with respect to members of Subclass 1 and Subclass 2 means the following:

(i)    any and all claims and damages, known or unknown, past, present and future, for injury to personal or real property, loss of use of, or access to, personal or real property, loss of rental value, real property value diminution, any "stigma" attaching to property, crop loss, lost animal and pet life, environmental and ecological loss of any kind,

19

arising out of, related to, resulting from, or connected in any way with the Incident;

(ii)     any and all claims and damages, known or unknown, past, present and future, for evacuation expenses, subsistence expenses, loss of business, interruption of business, loss of profits, loss of income, revenue or receipts, business costs, or business expenses, pecuniary loss or loss of earnings or impairment of earnings capacity or other forms of economic loss of any kind, arising out of, related to, resulting from, or connected in any way with the Incident;

(iii)    any and all claims and damages, known or unknown, past, present and future for inconvenience, evacuation, involuntary confinement, shelter-in-place, nuisance, and duress, and related fear, fright, mental anguish, anxiety, and emotional distress, arising out of, related to, resulting from, or connected in any way with the Incident; and

(iv)    any and all claims, known or unknown, for any type of exemplary or punitive damages whether enumerated or not, arising out of, related to, resulting from, or connected in any way with the Incident, only to the extent that such exemplary or punitive damage claims relate to or arise from the claims defined herein as Subclass 1 and Subclass 2 Released Claims.

b.     <u>Subclass 3 Released Claims</u>.  The term "Released Claim" with respect to members of Subclass 3 means the following:

(i)     any and all claims and damages, known or unknown, past, present and future, for personal physical injuries, bodily injuries, and emotional distress, mental anguish, loss of consortium, fear, fright, anxiety, future wrongful death, and any pecuniary loss or loss of earnings or impairment of earnings capacity or other forms of economic loss of any kind, arising out of, related to, resulting from, or connected in any way, with the Incident;

(ii)    any and all claims and damages, known or unknown, past, present and future, for alleged increased risk, possibility, or fear of suffering in the future from any disease, injury, illness, or condition or death therefrom, arising out of, related to, resulting from, or connected in any way with the Incident, including all claims for medical monitoring;

(iii) any and all claims, known or unknown, for any type of exemplary or punitive damages whether enumerated or not, arising out of, related to, resulting from, or connected in any way with the Incident; and

(iv) any and all claims and damages, known or unknown, past, present and future, as described above as Subclass 1 and Subclass 2 Released Claims.

"Released Entities" means any and all of the following: (i) Norfolk Southern Railway Company, Norfolk Southern Corporation, Olin Corporation, Rhodia, Inc., Union Tank Car Company, General American Transportation Corporation, a/k/a GATX, Sunbelt Chlor/Alkali Partnership, Poly One, Trinity Industries, Inc., ACF Industries, Inc., Gulbrandsen Manufacturing Co., Jones Chemicals, Inc.; (ii) any other manufacturers, owners, lessors, lessees, and consignees of the rail cars and products involved in the Incident; (iii) the manufacturers and installers of the rails, switches, bolts, and any other material used for the rail track or other railroad equipment at Graniteville, South Carolina; (iv) the Association of American Railroads; (v) Benjamin Aiken, Mike Ford, Jimmy Ray Thornton, William Wright, the estate of Christopher Seeling, A.D. Bryson, C.J. Veal, and R.L. Capps; (vi) any persons, business entities and agencies that assisted in or supported the emergency response and clean-up activities within the Evacuation Zones during the Incident, including the activities of private, public, and governmental agencies, entities and authorities, whether federal, state, county or local, their employees, officers, agents, members, and volunteers, provided that workers' compensation, contractual, or employee benefit claims against said persons, business entities, and agencies are not hereby released; (vii) Avondale Mills, provided that workers' compensation, contractual, or employee benefit claims against Avondale Mills are not hereby released; (viii) owners, lessors, and lessees of any other real property located at the site of the Incident, and (ix) to the same extent as if expressly named herein, the respective parents, subsidiaries and affiliated companies of those released entities identified in (i) through (ix) of this paragraph, their leased and operated lines, and all other persons, firms and corporations, all of the respective predecessors, successors, assignees, lessors, officers, directors, agents, contractors, subcontractors, attorneys, insurers, and employees of the Released Entities identified in (i) through (ix) of this paragraph, past and present, as well as their heirs and legal representatives.

16. Notwithstanding the dismissal with prejudice of the Released Claims described above, for those persons or entities who claim a subrogation interest for the amounts paid on behalf of a Class Member and who have properly opted out of the Class (an "Opt Out Subrogee"), the Class Member's Released Claims against the Released Entities will not affect the Opt Out Subrogee's

rights with regard to amounts in excess of the amount entitled to be paid to the Class Member under the Proposed Settlement.

17.    By entry of this Final Order and Judgment, all Class Members, and all other persons and entities claiming by, through, or on behalf of, a Class Member, are hereby forever barred and enjoined from commencing, filing, initiating, instituting, prosecuting, maintaining, or consenting to any action against the Released Entities with respect to the Released Claims and forever discharge and hold harmless the Released Entities of and from any and all Released Claims which the Class Member has or may hereafter have.  However, with regard to an Opt Out Subrogee, entry of this Final Order and Judgment and a Class Member's Released Claims against the Released Entities will not affect the Opt Out Subrogee's rights with regard to amounts in excess of the amount entitled to be paid to the Class Member under the Proposed Settlement.

18.    This Final Order and Judgment notwithstanding, the court retains continuing jurisdiction over the case, the Proposed Settlement, this Final Order and Judgment, the Class Members, the Class Representatives, and NSRC for the purpose of administering, supervising, construing, and enforcing the PSA and the Final Order and Judgment, and supervising the management and disbursement of the settlement and disputes that arise under the PSA.

19.    Class Counsels' Motion for Approval of an Award of Attorneys' Fees is **GRANTED**. The court finds, after an evaluation of Class Counsel's fee petition with respect to the factors set forth in Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 (4th Cir. 1978), that the formula to calculate Class Counsel's fees is reasonable and that the formula employs a reasonable percentage of the actual benefit of the class settlement to the Class.  With respect to the Barber factors most relevant here, the court finds that Class Counsel have expended considerable time and labor in the negotiation

22

and implementation of the Proposed Settlement, and that this work will be on-going; that the efforts of Class Counsel have resulted in a resolution that confers substantial benefits on members of the Class, and that those benefits are comparable to other similar settlements and were achieved sooner than most, if not all, similar settlements; that Class Counsel undertook this matter with no guarantee of payment and thus shouldered considerable risk; and that the attorneys' fees award in this case is not inconsistent with awards in similar cases

20.     FINAL JUDGMENT is hereby ENTERED dismissing with prejudice all Released Claims of the Class against all Released Entities as herein described.

21.     Pursuant to Fed. R. Civ. P. 54(b), the court determines that there is no just cause for delay and expressly DIRECTS the ENTRY OF JUDGMENT on all issues contained in this Order.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
United States District Judge

Columbia, South Carolina

August 24, 2005

23

## **Exhibits**

| | |
|---|---|
| Exhibit A | List of Class Counsel |
| Exhibit B | Report of Guardian Ad Litem, Georgina Riley |

## EXHIBIT A

GRANITEVILLE PLAINTIFFS' STEERING COMMITTEE (CLASS COUNSEL)
(Alphabetical by Firm Name)

Michael J. Leizerman
EJ LEIZERMAN & ASSOCIATES, LLC
717 Madison Avenue
Toledo, OH 43624

Harry L. Goldberg
FINKEL & ALTMAN, LLC
P.O. Box 1799
Columbia, SC 29202

Carl L. Solomon
Richard M. Gergel
GERGEL NICKLES & SOLOMON, PA
1519 Richland Street
Columbia, SC 29201

Gregory L. Jones
GREG JONES & ASSOCIATES, P.A.
3015 Market Street
Wilmington, NC 28403

John F. Hardaway
1338 Pickens Street
Columbia, SC 29201

Thomas E. Hite, Jr.
HITE & PRUITT
P.O. Box 805
Abbeville, SC 29620

Paul H. Hulsey
Marco T. Torres
W. J. Cook
HULSEY LITIGATION GROUP, LLC
Charleston Harbor
2 Wharfside 3
Charleston, SC 29401

Ronnie G. Penton
LAW OFFICES OF RONNIE G. PENTON
209 Hoppen Place
Bogalusa, LA 70427

Ronald A. Maxwell
MAXWELL LAW FIRM, PC
225 Chesterfield St., NW
P. O. Box 1115
Aiken, SC  29801

John G. Felder, Jr.
McGOWAN HOOD & FELDER
3710 Landmark Drive, Suite 114
Columbia, SC 29204

Joseph F. Rice
Frederick J. Jekel
MOTLEY RICE LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465

John E. Parker
PETERS MURDAUGH PARKER ELTZROTH & DETRICK, PA
303 1st Street, East
Hampton, SC  29924

Ronnie L. Crosby
PETERS MURDAUGH PARKER ELTZROTH & DETRICK
P.O. Box 457
Hampton, SC 29924-0457

W. Mullins McLeod, Jr.
PIERCE, HERNS, SLOAN & McLEOD, LLC
P.O. Box 22437
Charleston, SC  29413

Terry Richardson, Jr.
J. David Butler
RICHARDSON, PATRICK WESTBROOK & BRICKMAN, LLC
P.O. Box 1368
Barnwell, SC 29812

17

A. Hoyt Rowell, III
T. Christopher Tuck
RICHARDSON PATRICK WESTBROOK & BRICKMAN, LLC
P.O. Box 1007
Mt. Pleasant, SC 29465

Joseph Preston Strom, Jr.
STROM LAW FIRM, LLC
1501 Main Street, Suite 700
Columbia, SC 29201

Barry Reed
Zimmerman Reed, PLLP
14646 N. Kierland Boulevard
Suite 145
Scottsdale, AZ  85254-2762

# REPORT BY GEORGINA RILEY, GUARDIAN AD LITEM
### Re: Graniteville Class Action Settlement

My name is Georgina Riley and I serve as the Guardian Ad Litem in the Graniteville Class Action Settlement. I live on 623 Douglas Dr., Aiken, S.C. I am a Licensed Social Worker and a teacher. I have 33 years of experience working with children for the Department of Social Services, the Aiken County Public Schools and the Barnwell School District 45. My role in the settlement process is to make an independent investigation on behalf of Class Members who are minors or who lack capacity and to make a recommendation to the Court as to the fairness of the Settlement Agreement as to those individuals. In addition, I have evaluated the Settlement Agreement as to how it has been made available and accessible to homebound individuals and the Spanish-speaking community.

A train collision and derailment involving a Norfolk Southern Railway Company train occurred on January 6, 2005, in Graniteville, S.C. Subsequent to this incident there was release of chlorine, emergency responses, clean-up, and mandatory evacuation of numerous people within a one mile radius, designated as Zone A, and certain areas outside the one mile radius, designated as Zone B. The length in days of evacuation differed from 3 days to 13·days depending on the place of residency.

I first began my investigation on July 6, 2005, when I met with Claire Xidis, Counsel with Motley Rice law firm. She provided me with a firm resume for Richardson, Patrick, Westbrook & Brickman, LLC, and for Motley Rice, LLC, which I have reviewed. She also made available for me to review the two affidavits from Dr. Steven M Koenig, M.D., and Dr.Alan R. Leff M.D.

My first visit to the Claims Center in Graniteville, S.C. was on July 7, 2005 when I met with Diane Bodiford to understand the application process. I observed several applicants making claims at the Center including the intake process for claims of minor children. I looked at completed files and reviewed the filing system used by the Center staff.

There were several more visits made to the Center to meet with Brad Oliver, Counsel with Motley Rice, LLC. Mr. Oliver was making every effort to reach out to the disabled, homebound individuals to get their applications filed. I accompanied Mr. Oliver in making five home visits within the one mile radius. I observed Mr. Oliver assisting individuals that were homebound and mentally incompetent.

On one of my visits to the Center, I was able to meet with the Spanish interpreter, Alex Miranda, who was helping the Spanish speaking residents with their applications. Alex was very familiar with the Spanish speaking community in the area since he has been a resident for many years. Alex's father is a business man in the community who also knows the Spanish speaking population in the Graniteville area. It's my understanding that notices had been published in the Spanish newspaper and discussion had taken place in the local churches regarding the claims process.

As a result of my investigation, I find that:
Class Members who are minors have been fairly treated and represented in the settlement agreement.

1. Class Counsel has implemented procedures to make sure that minors are included in the settlement and that their claims are not compromised. Under Subclass 3, these individuals received equivalent compensation to all other Class Members.

2. Class Members who lack mental capacity have been fairly treated and represented in the settlement agreement. Class Counsel has implemented procedures to make sure that those individuals who lack mental capacity are included in the settlement and that their claims are not compromised. Under Subclass 3, these individuals received equivalent compensation to all other Class Members.

Additionally, I find that Class counsel has taken measures to ensure that the Spanish speaking community has been adequately reached and that Spanish-speaking individuals have been able to receive assistance in Spanish at the claims center. Furthermore, Class Counsel has reached out to individuals who are unable to come to the claims center in order to provide them with assistance with their claims. This has provided access to the claims process for those who otherwise would not have been able to obtain assistance.

Submitted on August 8, 2005.

Georgina Riley
*Guardian Ad Litem*